**RIVER OAKS HOMES ASSOCIATION,**
**Respondent,**

v.

**Zeria LOUNCE, Individually and as Trustee of the Zeria Lounce Revocable Trust, Appellants.**

**No. WD 73608.**

Missouri Court of Appeals,
Western District.

Jan. 17, 2012.

James B. Jackson, Independence, MO, for Appellants.

Patrick B. Starke, Blue Springs, MO, for Respondent.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, and JAMES M. SMART, JR., and GARY D. WITT, Judges.

KAREN KING MITCHELL, Presiding Judge.

Zeria Lounce and the Zeria Lounce Trust (collectively "Appellants") appeal the judgment of the Circuit Court of Jackson County, Missouri ("trial court"), granting the River Oaks Homes Association ("the Association") assessments owed pursuant to the applicable covenants in the amount of $17,397.62. On appeal, Appellants argue that the trial court erred: (1) in finding Lounce individually liable for the unpaid assessments on the River Oaks property since she no longer owned the property when the assessments were set; (2) in finding the trust liable because there were no assessments billed in the name of the trust; and (3) in finding the assessments proper in the first instance, in that the Association did not follow the mandatory procedures for setting assessments. We affirm the judgment of the trial court as to the trust's liability for the assessments, but reverse the judgment against Lounce individually.

**Factual and Procedural Background[1]**

■ On November 19, 1973, developer Merrywood Development Company ("Developer") filed with the office of the Recorder of Deeds for Jackson County, Missouri, a "Homes Association Declaration" ("HAD") and also a "Declaration of Restrictions, Covenants and Conditions of Merrywood" ("Restrictions and Covenants"). Both of these documents pertained to a residential housing develop-ment that was, at least initially, to be known as Merrywood.

The Restrictions and Covenants provided that "[e]ach owner of any Lot within The Properties by acceptance of a deed therefor whether or not it shall be so expressed in any such deed or conveyance, shall be deemed to covenant and agree to pay to the Association[2] ... annual assessments or charges." The document continued, providing that the assessments:

shall be a charge on the land and shall be a continuing lien upon the property against which each such assessment is made. Each such assessment together with such interest thereon and cost of collection thereof as hereinafter provided, shall also be the personal obligation of the person who was the Owner of such property at the time when the assessment fell due.

The HAD contained a similar provision and also contained a paragraph relating to the payment of annual assessments. That paragraph is set forth in its entirety here.

2. *Payment of Annual Assessments.* Prior to the beginning of each calendar year, the Association shall prepare a Budget for the ensuing calendar year and such Budget shall cover the estimated costs of maintaining the Common Areas and performing all of the obligations and exercising the powers established under this Declaration. On the basis of this Budget, the monthly assessments for each owner of each unit for the ensuing year shall be established by the Association on the basis that the costs as estimated under such Budget shall be borne equally by the owners of

---

1. We review all evidence, and all inferences that may be derived from the evidence, in the light most favorable to the trial court's judgment. *Young v. Pitts,* 335 S.W.3d 47, 50 n. 4 (Mo.App. W.D.2011).

2. "Association" is defined in the Restrictions and Covenants to be "the Merrywood Homes Association."

the units. The monthly assessments shall be paid on the first day of each calendar month in each calendar year and shall be deemed delinquent after the tenth day of such month. At the end of each calendar year the Association shall determine as soon as possible all of the costs incurred in the year just past, and if the costs have exceeded the Budget, the deficiency shall be taken into account and defrayed as part of the Budget for the following calendar year. Because of the time lag in assembling costs at the end of a year, the monthly assessment for the prior year shall continue until a new monthly assessment can be determined in accordance with the new budget and any deficit as a result of using the old mont[h]ly assessment shall be made up in the new monthly assessment. If there is an excess of money collected from the monthly assessment over the costs for such year, such excess shall also be taken into account in preparing the Budget for the following calendar year. All computations relating to obligations to be performed under this Declaration shall be accomplished in accordance with accepted accounting practices and, as part of the Common Areas cost, the Association shall employ a firm of Certified Public Accountants to render a written audit of its operations for each calendar year and a copy of such written audit shall be given to the owners of each unit.

On February 27, 1976, the Merrywood Homes Association officially changed its name to The River Oaks Homes Association No. 1 ("the Association").

On January 28, 1993, Zeria Lounce purchased a home in the Merrywood/River Oaks subdivision ("Fallkirk townhouse"), subject to "all covenants, conditions, restrictions, easements, rights-of-way and other matters of record." Lounce paid all assessments due on her property in 1993. On April 11, 1994, Lounce transferred her interest, via quit-claim deed, to her revocable living trust, with herself as trustee. Lounce continued to pay the assessments on the property for some time after the transfer, using both her own personal money and trust money to purchase money orders to pay the assessments. Lounce never lived in the home, but her daughter lived there for awhile.

In 2004, Lounce stopped paying the assessments as they became due. The Association shut off the water to the Fallkirk townhouse as a result of the nonpayment. The Association continued to send notice of the assessments due to the Fallkirk townhouse by mail. The Association sued Lounce individually in December, 2010, for the $17,397.62 then due in unpaid assessments. Upon becoming aware of Lounce's transfer of the property to the trust, the Association amended its petition to include Zeria Lounce, as trustee.

At trial, Margaret Kelly, general manager of the Association, testified as to the process used by the Association to set assessments. Kelly testified that each year, the Association, through its board of directors, creates a budget determining its financial needs and then divides the expense equally among the residents. The Association also presented the minutes from its annual meetings, which mentioned the budgets and listed some of the expenses that were considered when calculating the amount of the assessments. The meetings were open to all homeowners, and the homeowners received notice of the meetings through monthly newsletters that were mailed to their subdivision properties. No CPA audits of the operation of the Association, as provided for in the HAD, were ever conducted.

The trial court found the Association's evidence regarding compliance with its

own procedures to be credible and that "the amount of the assessments is appropriate and was set in accordance with the directions of the covenants, bi-laws and rules of the organization." The trial court found for the Association against Lounce, individually and as trustee, in the amount of $17,397.62. Lounce filed a motion for new trial, which was overruled. This appeal follows.

## Standard of Review

■ As in any court-tried case, we will affirm the judgment of the trial court unless it is not supported by substantial evidence, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the trial court's determination of the credibility of the witnesses. *Sanders v. Ins. Co. of N. Am.*, 42 S.W.3d 1, 8 (Mo.App. W.D.2000).

## Legal Analysis

■ Appellants' first point on appeal is that the trial court erred in finding Zeria Lounce, individually, liable for the unpaid assessments in that she was not the owner of record of the Fallkirk townhouse at the time the unpaid assessments became due. Lounce deeded the property to the trust on April 11, 1994. Lounce continued to pay the assessments on the property as they became due, using both her own money and money from the trust, until January of 2004. Therefore, when the default on the assessments occurred, Zeria Lounce indisputably was not the property owner of record. The Restrictions and Covenants provided that the assessments:

> shall be a charge on the land and shall be a continuing lien upon the property

against which each such assessment is made. Each such assessment together with such interest thereon and cost of collection thereof as hereinafter provided, shall also be the personal obligation of the person who was the Owner of such property at the time when the assessment fell due.

The Restrictions and Covenants defines "owner" as "the record owner ... of the fee simple title." The property was owned by the trust, with Zeria Lounce as trustee, and the trust's ownership was recorded. Thus the trust, not Lounce individually, would have been liable for the unpaid assessments.

The Association counters that, according to section 456.10–1010,[3] Lounce individually is liable for the assessments because she did not disclose her status as trustee. The statute provides, "Except as otherwise provided in the contract, a trustee is not personally liable on a contract properly entered into in the trustee's fiduciary capacity in the course of administering the trust *if the trustee in the contract disclosed the fiduciary capacity*." § 456.10–1010.1 (emphasis added). The Association also cites *Hale & Hale, Ltd. v. Arnold and Jeanie Pettit Declaration of Trust*, 298 S.W.3d 104, 109 (Mo.App. W.D.2009). In *Hale*, we found a trustee individually liable on a real estate contract where the trustee signed the contract as an individual, not disclosing his status as trustee. *Id.* Section 456.10–1010 is inapplicable. This is not a situation where Lounce, as trustee for the revocable trust, entered into a contract with the Association and failed to disclose her role as trustee.

■ Lounce admits she never notified the Association that she had transferred

---

3. All statutory references are to RSMo 2000, as updated through the 2010 cumulative supplement, unless otherwise noted.

the property to her trust, but there is nothing in the Restrictions and Covenants or the HAD that requires an owner to notify the Association of such a transfer in ownership.[4] Lounce did record the quit-claim deed, which clearly evidences her transfer of the property to the trust and her status as trustee. Section 442.390 states that any instrument in writing, "certified and recorded in the manner herein prescribed, shall, from time of filing the same with the recorder for record, impart notice to all persons of the contents thereof." The parties argue about whether this section applies to the Association, because the Association's interest in the property arose before Lounce transferred the property to her trust. We find this aspect to be irrelevant. Because the obligation to pay assessments runs with the property, the obligation to pay assessments transfers with the property to the new owner. The Association provides no authority stating that a post-transfer assessment remains the obligation of the pre-transfer property owner, and we see no reason why this case should be any different than those where the property is sold to another owner unaffiliated with the seller. In those cases, absent fraud, the seller is generally not obligated to continue paying assessments on the property after the sale—the assessments become the obligation of the buyer. It follows, then, that the Lounce trust, as the new owner of the property, would be solely responsible for the post-transfer assessments. Lounce disclosed her status as trustee on the quit-claim deed and was not required to make any other disclosure to the Association. Therefore, she is not personally liable for the post-transfer assessments.[5] The trial court erred in ruling otherwise.

Appellants' second point on appeal is that the trial court erred in finding that either Lounce individually or the Lounce trust is liable for any assessments imposed by the Association because: (1) the Association did not have authority to impose assessments; (2) there were no ascertainable standards for calculating the assessments; and (3) in any case, the Association did not follow the mandatory procedures set forth in the operative documents for the setting of assessments. We reject all three arguments.

■ First, Appellants argue that the Developer did not delegate its power of assessment to the Merrywood Homes Association (MHA) nor did it delegate its power of assessment to the River Oaks Homes Association (Association), as the successor to MHA. We disagree. As noted above, in 1973, the Developer filed with the office of the Recorder of Deeds for Jackson County, Missouri, the HAD and the Restrictions and Covenants for the Merrywood housing development. Both documents were signed on behalf of Merrywood Development Company by the president of Tri City Construction Company as its "designated title holder." The Declarations and Restrictions calls for the

4. The HAD does require that an owner give the Association prior notice of any sale or lease so that the Association can exercise its right of first refusal. The transfer of the property to the Zeria Lounce Trust is not a sale or lease that triggers this requirement.

5. We reject Appellants' argument that the Trust is not liable for the assessments because such assessments were in the name of Zeria Lounce rather than the Zeria Lounce Trust.

As noted above, the obligation to pay assessments runs with the property, and therefore, the obligation transfers with the property to the new owner. In addition, under the facts of this case, the Trust cannot argue that it was unaware of the obligation to pay the assessments as Lounce, the trustee for the Trust, was aware of the obligation and did in fact pay the assessments for a period of time after the transfer in ownership.

creation of the MHA and calls for the MHA to be incorporated as a not-for-profit corporation. The HAD made all owners of lots in the Merrywood development members of the MHA. Both documents obligated owners of property in the Merrywood development to pay assessments to the MHA. The Articles of Incorporation of the MHA expressly referenced the HAD. In 1976, the MHA officially changed its name to the River Oaks Homes Association No. 1 (the Association that is a party to this litigation). The legal authority cited by the Appellants does not support their allegation that the MHA lacked authority to make assessments or that that authority did not continue with the River Oaks Homes Association, upon the name change.

■ Next, Appellants argue that the HAD and the Declarations and Restrictions established no ascertainable standard for setting assessments. Appellants contend that since the amount of the assessments is not set by either document, the documents must establish a clear, equitable and unambiguous method for calculating the assessments. Although Appellants contend that the Association failed to show compliance with this standard, Appellants fail to articulate in what way the documents or other evidence presented are lacking. Because the HAD and the Declaration of Restrictions together identify the types of expenses that may be considered in establishing the assessments and provide that the amounts assessed will be equally divided among the properties in the subdivision, we find that the trial court did not err in finding that the documents provided a sufficient method for setting assessments.

■ Finally, Appellants argue that the Association did not follow the mandatory procedures set forth in the operative documents for the setting of assessments. Specifically, Appellants contend that the Association failed to establish that a quorum was present at all times that assessments were set, that it failed to give homeowners the required notice before assessments were set, that it failed to show that it employed accepted accounting principles in setting assessments, and that it failed to conduct required CPA audits. Appellants raise these issues not as part of any objection to a particular portion of the assessments, but claim that these requirements are, in essence, conditions precedent to establishing enforceable assessments, and, thus, that the Association's failures render the assessments entirely invalid. As such, they are in the nature of affirmative defenses. *See* *Brentmoor Place Residents Ass'n v. Warren,* 816 S.W.2d 7, 9 (Mo.App. E.D.1991) (allegation that a homeowners association failed to properly conduct officer elections in order to avoid compliance with association's actions was an affirmative defense). Therefore, they should have been raised in Appellants' answer with their other affirmative defenses including payment, statute of limitations, and waiver.[6] The allegations at issue here were not raised until Appellants filed their trial brief on the day of trial. Because Appellants' compliance-related affirmative defenses were not raised in a timely manner, they are waived.[7] Accordingly, the trial court's

6. Although this matter was tried before an Associate Circuit Judge under the procedures of Chapter 517, and, thus, no answer was required, Appellants did file an answer containing their other affirmative defenses, and in any event, section 517.031.2 requires affirmative defenses to be pled.

7. The same analysis could have been used to address Appellants' other two claims, that the MHA lacked authority to make assessments or that that authority did not continue with the River Oaks Homes Association, and that the HAD and the Declarations and Restrictions established no ascertainable standard for set-

judgment enforcing the assessments was not in error, at least as against the Lounce trust.

### Conclusion

Because Zeria Lounce was not the owner of the River Oaks property at the time when the assessments reportedly became due, we reverse the judgment of the trial court against Lounce individually. The judgment is in all other respects affirmed.

JAMES M. SMART, JR., and GARY D. WITT, Judges, concur.

ting assessments: both alleged claims should have been raised as affirmative defenses, but were not, and, thus, were waived.